# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| DERYCK LONG, | ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) | Civil Action No. 17-12064-FDS |
| SEAN MEDEIROS, | ) ) ) | |
| Respondent. | ) ) | |

# MEMORANDUM AND ORDER ON
# PETITION FOR A WRIT OF HABEAS CORPUS

**SAYLOR, J.**

This is a *pro se* petition for a writ of habeas corpus by a prisoner in state custody. On March 21, 2011, a Massachusetts jury found petitioner Deryck Long guilty of first-degree murder and illegal possession of a firearm. He was sentenced to life imprisonment without possibility of parole.

Long has filed a petition for a writ for habeas corpus pursuant to 28 U.S.C. § 2254, alleging ineffective assistance of counsel in violation of the Sixth Amendment and an illegal search in violation of the Fourth Amendment. The petition is based on defense counsel's alleged failure to investigate and introduce evidence obtained from cell-phone records and the trial court's denial of a motion to suppress testimony obtained as a result of an illegal wiretap. For the reasons set forth below, the motion will be denied.

I.  **Background**

   A.  **Factual Background**

The facts of this case are taken from the decision of the Supreme Judicial Court.  *See Commonwealth v. Long*, 476 Mass. 526 (2017).

On January 9, 2006, Jamal Vaughan, the victim, was found shot to death in a parking lot behind an apartment complex in Quincy, Massachusetts.  *Id.* at 527-28.

From late 2005 to early 2006, Deryck Long would frequently stay with his girlfriend, Janet Ojo, at her house on Franklin Street in Quincy.  *Id.* at 527.  About two weeks before Vaughan's death, Long and Ojo ended their relationship, apparently over a money dispute.  *Id.*  On the night of January 9, 2006, Long asked a friend named Courtney Forde to drive him to Ojo's house to pick up some belongings he had left there.  *Id.*  Forde picked him up in his car, bringing along his friend and drug-dealing associate, Paul Brown, and an unidentified woman Forde had recently met.  *Id.*

When they arrived at Ojo's house around 9:45 p.m., Long got out of the vehicle and went inside.  *Id.*  Ojo was not home, but a few of her friends were inside, including Vaughan.  *Id.*  Long and Vaughan got into a fistfight about money that Long allegedly stole from Ojo.  *Id.*  The fight spilled out onto the front yard.  *Id.*  After Brown got out of Forde's car, Vaughan ran back inside the house.  *Id.*  Long tried to re-enter the house and threw a brick through one of the windows.  *Id.*

Long and Brown got back into Forde's car and drove a short distance, then stopped because Long remembered he had left some "IDs" behind in a shoebox.  *Id.* at 527-28.  He, Brown, and Forde walked back to Ojo's house.  *Id.* at 528.  Vaughan was outside and ran back into the house when he saw them approaching.  *Id.*  They drove back to Boston and dropped off

the unidentified woman in Milton. *Id.* They stopped at the house in Mattapan where Long was staying and retrieved his keys to Ojo's house. *Id.* Forde drove them back to Ojo's house. *Id.* Nobody was home, and they entered using Long's keys. *Id.* They took various items, including two handguns stored in a shoebox: a revolver and a Tec-9 semiautomatic pistol. *Id.* Long put the revolver on his waist. *Id.*

Long directed Forde to drive to an apartment building on Willard Street in Quincy where he had stayed with Ojo in the past. *Id.* Forde called two of his drug customers who lived in the apartment building to ask one of them to open the back door so Long could enter the building. *Id.* Neither customer answered. *Id.* Forde parked his car in a dimly-lit spot near some trees, far from the entrance to the building. *Id.* At the same time, Vaughan left the building to retrieve cigarettes from his car. *Id.* Long and Brown exited Forde's car, walked over to Vaughan, and shot him several times. *Id.*

Around midnight, a neighbor at the apartment building telephoned 911 to report hearing gunshots. *Id.* Police and emergency services responded to the scene, where they discovered Vaughan with three gunshot wounds. *Id.* Vaughan was transported to the hospital, where he was pronounced dead. *Id.*

After the shooting, Forde drove back to his house in Boston. *Id.* Forde then drove to a friend's house, where Long, Brown, and Forde unloaded the items taken from Ojo's house, including a shoebox containing a rusty firearm and its magazine. *Id.* at 528-29.

Police recovered two spent projectiles, fired from two different weapons, from Vaughan's body. *Id.* at 528. Police also recovered seven shell casings, all of which came from the same 9-millimeter pistol, and a spent projectile that was "mostly" consistent with having been shot from a revolver. *Id.*

3

## B. Procedural Background

Police arrested Long on January 10, 2006. *Id.* at 534. On January 20, the Commonwealth obtained a warrant authorizing the placement of a wiretap on a booth in the visiting room at the Norfolk County House of Correction in order to monitor conversations between Long and his visitors. *Id.* at 533. As a result of the wiretap recordings, police identified another witness, Gillian Gibbs, and obtained more information on Forde's involvement in the shooting. *Id.*

Long filed a pretrial motion to suppress evidence obtained from the wiretap, which the motion judge allowed. *Id.* The motion judge concluded that the wiretap did not meet the requirements of Mass. Gen. Laws ch. 272, § 99, because the Commonwealth failed to establish that the offense under investigation was committed in connection with "organized crime." *Id.*

After an evidentiary hearing to determine the scope of the evidence to be suppressed, the motion judge excluded the recording of the conversation between Long and Gibbs, and any testimony by Gibbs. *Id.* at 534. The judge found that Gibbs's decision to speak with police was directly motivated by the fact that they confronted her with the wiretap evidence. *Id.* However, the judge did not exclude Forde's testimony, concluding that his decision to testify was sufficiently attenuated from the unlawful wiretap, which had occurred five months earlier, to dissipate the taint of illegality. *Id.*

The Supreme Judicial Court affirmed the motion judge's decision, holding that there was no error in the judge's determination that the taint of the illegal wiretap was sufficiently attenuated as to allow Forde's testimony. *Id.* at 527, 534, 537-38. On March 21, 2011, a jury in Norfolk Superior Court convicted Long of one count of first-degree murder based on deliberate premeditation and one count of illegal possession of a firearm. He was sentenced to life

imprisonment without possibility of parole.

On August 8, 2014, he filed a motion for a new trial, alleging ineffective assistance of counsel based on defense counsel's failure to present Cell Site Location Information ("CSLI") to discredit the testimony of Forde, a critical witness for the Commonwealth. The trial judge denied the motion on April 17, 2015.

Long appealed his conviction to the SJC, which was consolidated with the appeal from the denial of the motion for a new trial. The SJC denied his consolidated appeal on February 24, 2017. 476 Mass. 526.[1]

Long timely filed the present petition on October 17, 2017, alleging violations of his Fourth and Sixth Amendment rights. *See* 18 U.S.C. § 2254(d). The petition presents two grounds: (1) that defense counsel's failure to investigate and introduce the CSLI data to impeach Forde's testimony constituted ineffective assistance of counsel; and (2) that the denial of Long's motion to suppress Forde's testimony was in error. (Pet. at 23, 48).

## II. **Standard of Review**

Because Long appears *pro se*, his pleadings must be construed more leniently than those drafted by an attorney. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, a petitioner's *pro se* status does not excuse him from complying with procedural and substantive requirements of the law. *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997).

Under 28 U.S.C. § 2254(d), a federal court may not issue a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an

---

[1] He did not seek further review from the United States Supreme Court.

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is "contrary to" clearly established federal law if it (1) "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or (2) resolves a case differently from the Supreme Court on a set of "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). In either scenario, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to Supreme Court precedent. *Williams*, 529 U.S. at 405.

A state-court decision involves an "unreasonable application" of federal law if the state court identified the correct governing legal principle from the Supreme Court's decisions, but applied it in an objectively unreasonable manner. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citing *Williams*, 529 U.S. at 409). The Supreme Court has cautioned that "[a]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. The state court's application of federal law must be "more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75 (citing *Williams*, 529 U.S. at 410, 412); *see also Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007) ("A decision can still be reasonable even if the reviewing court thinks it is wrong; 'unreasonable' here means something more than incorrect or erroneous."). Furthermore,

> if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application . . . . [S]ome increment of incorrectness beyond error is required. The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court.

*McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (internal citations and quotation marks omitted).

Federal courts must presume the correctness of state courts' factual findings unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III. Analysis

### A. Ineffective Assistance of Counsel

#### 1. Standard

Claims for ineffective assistance of counsel under the Sixth Amendment must satisfy the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance, a petitioner must establish both (1) that his counsel provided deficient assistance and (2) that he suffered prejudice as a result. *Id.* at 687.

The first prong of the *Strickland* test requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. There is a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689); *see also Genius v. Pepe*, 147 F.3d 64, 66 (1st Cir. 1998) ("[C]ounsel's judgments in formulating the defense strategy are entitled to substantial deference."). A petitioner may overcome the presumption by demonstrating that counsel's alleged errors were so serious that his performance "fell below an objective standard of reasonableness under the circumstances." *Sleeper v. Spencer*, 510 F.3d 32, 38 (1st Cir. 2007) (citing *Strickland*, 466 U.S. at 688); *see also Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006).

The Sixth Amendment does not guarantee either a perfect or a successful defense. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (stating that the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight"). "It is only where, given the facts at the time, counsel's choice was so patently unreasonable that no

competent attorney could have made it, that the ineffective assistance prong is satisfied." *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006) (quotations omitted); *see also Epsom v. Hall*, 330 F.3d 49, 54 (1st Cir. 2003) ("Trial lawyers make countless tactical choices and unless the net reckoning is 'patently unreasonable,' counsel's judgment is not constitutionally defective.").

"[T]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options." *Strickland*, 466 U.S. at 680. Defense counsel is required "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "[S]trategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitation on investigation." *Id.* at 690-91.

The second prong of the *Strickland* test requires a petitioner to show that counsel's deficient performance resulted in "prejudice" – that is, that "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result was reliable." *Strickland*, 466 U.S. at 687. Stated differently, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Sleeper*, 510 F.3d at 39.

The Supreme Court has noted that "[s]urmounting *Strickland*'s high bar is never an easy task." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d)" is difficult because both standards are "'highly deferential.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential

8

standard." *Id*. A petitioner alleging ineffective assistance of counsel under § 2254 must not only demonstrate that counsel was ineffective under the *Strickland* standard, but "must also demonstrate that the state court's denial of his claim was objectively unreasonable." *Abrante v. St. Amand*, 595 F.3d 11, 19 (1st Cir. 2010).

### 2. **Analysis**

Long alleges that his counsel rendered ineffective assistance in violation of the Sixth Amendment by failing to introduce CSLI data to discredit Forde, who provided critical testimony for the Commonwealth, and by failing to investigate that data sufficiently.

The first issue concerns defense counsel's failure to introduce the CSLI data. That was a strategic decision that amounts to ineffective assistance only if it was "so patently unreasonable that no competent attorney could have made it." *See Knight*, 447 F.3d at 15.

Long contends that defense counsel erred in not introducing available CSLI records of conversations between Forde and his girlfriend, Maria DeRosa. He specifically contends that Forde testified at the trial that upon leaving Franklin Street, he drove south to Quincy; however, the CSLI data indicated that he in fact traveled north. He further contends that this inconsistency should have been used by defense counsel to attack Forde's credibility. During Brown's trial in January 2011, his defense counsel used the CSLI evidence to discredit Forde and his claimed version of events. A telecommunications expert was called to testify regarding cell-tower tracking of the cellular phones. Brown was ultimately found not guilty of first-degree murder.[2]

---

[2] Long also contends that the trial judge applied the incorrect standard for ineffective assistance of counsel when denying his motion for a new trial. However, he raised his ineffective assistance of counsel claim before the SJC, and the court rejected it under the more favorable standard of review that he seeks. *See Long*, 476 Mass. at 529 ("In reviewing a claim of ineffective assistance in a case of murder in the first degree, we apply the more favorable standard of review of a substantial likelihood of a miscarriage of justice, pursuant to [Mass. Gen. Laws Ch.] 233, § 33E."). Applying the more favorable standard, the court specifically found that Long had not established that counsel's decision not to use the CSLI data was manifestly unreasonable. *See id.* at 530-31.

9

Under the circumstances, counsel's decision was not patently unreasonable, and in any event the SJC's decision was not an unreasonable application of *Strickland*. As the SJC concluded, it was not unreasonable for defense counsel to decline to introduce the CSLI data. The CSLI data placed Forde in Quincy at the time of the shooting. Defense counsel certainly could have reasonably concluded that the cost of corroborating Forde's presence at the shooting outweighed the benefit of contradicting Forde's testimony about a slight inconsistency in his timeline of events. Defense counsel's strategic decision to not introduce the CSLI data deserves substantial deference. *See Genius*, 147 F.3d at 66.

The SJC's conclusion that defense counsel's strategy was not unreasonable because he discredited Forde in other ways also satisfies the constitutional standard. *See Long*, 476 Mass. at 531-32. As the SJC found, instead of introducing the CSLI data that placed Forde at the scene of the murder, defense counsel "was able to challenge Forde's testimony" through "rigorous[]" cross-examination about "inconsistencies between the version of events that he initially told police and his testimony at trial." *See id.* at 531. Defense counsel also attacked Forde's character through cross-examination about, among other things, his drug dealing, prior arrests, and plea agreement.[3] Habeas relief is not required where the tactic counsel did not pursue would merely serve to further impeach a trial witness who was already discredited. *Malone v. Clarke*, 536 F.3d 54, 67 (1st Cir. 2008) (counsel not ineffective where the "potential impeachment value of [a witness's testimony] would not have significantly undermined [the testifying victim's] credibility"). Defense counsel could have reasonably concluded that Forde was already sufficiently discredited. At a minimum, the SJC's decision that defense counsel's strategic choice not to use the CSLI data to further impeach Forde was reasonable was not contrary to or

---

[3] In exchange for pleading guilty to a lesser charge and testifying against Long and Brown, Forde received a sentence of time served and probation.

an unreasonable application of federal law.

As to defense counsel's alleged failure to investigate the CSLI data, the initial inquiry is whether counsel's decisions were so patently unreasonable that no competent attorney could have made them. *See Strickland*, 466 U.S. at 690-91. Long contends that defense counsel failed to understand and investigate the CSLI data. He specifically contends that defense counsel did not acquire Forde's testimony at Brown's trial, did not watch Brown's trial, had only a general understanding of the telecommunications expert's testimony, and failed to recognize the importance of the CSLI data. However, as the SJC found, defense counsel attested that he was aware that a telecommunications expert could testify at trial. *See Long*, 476 Mass. at 533. He further attested that he investigated the CSLI data by speaking to Brown's defense counsel and obtaining a copy of Forde's telephone records. *See id.* Defense counsel therefore made efforts to understand and investigate the potential value of the CSLI data—efforts that do not fall below the level necessary to sustain an ineffectiveness claim. As the SJC observed, "defense counsel appreciated the value of the CSLI evidence and, as the trial progressed, continued to gauge the usefulness of this evidence." *See id.* Again, and at a minimum, the SJC reasonably concluded that Long's defense counsel adequately investigated use of the CSLI data, and that decision was not contrary to or an unreasonable application of federal law.

In summary, the CSLI data would, at most, only impeach a small portion of Forde's testimony—his timeline of events—and carried a significant risk of corroborating the government's case. Defense counsel's strategic decision not to offer such evidence was not patently unreasonable, and the SJC's decision that counsel was not constitutionally ineffective was not contrary to or an unreasonable application of clearly established federal law. The claim under the Sixth Amendment for habeas relief will therefore be denied.

B. **Fourth Amendment Claim**

1. **Standard**

Petitioners seeking federal habeas corpus review may not invoke Fourth Amendment claims where they have "been afforded the opportunity for full and fair consideration of their reliance upon the exclusionary rule with respect to seized evidence by the state courts at trial and on direct review." *Stone v. Powell*, 428 U.S. 465, 489 (1976). That principle survived the enactment of the Antiterrorism and Effective Death Penalty Act in 1996, which generally altered the standard for federal habeas review of state court decisions. *Sanna v. DiPaolo*, 265 F.3d 1, 8 (1st Cir. 2001). If a petitioner has a full and fair opportunity to litigate, federal courts "lack[] the authority, under *Stone*, to second-guess the accuracy of the state court's resolution of those claims." *Id*. A petitioner claiming that he did not receive a full and fair opportunity to litigate his Fourth Amendment claim bears the burden of proof. *Id.*

2. **Analysis**

Long contends that the trial court erred in denying his motion to suppress Forde's testimony. His Fourth Amendment claim was litigated at trial and on appeal with the SJC following a full evidentiary hearing to determine the scope of suppressed evidence. The motion judge's opinion, which was affirmed by the SJC, held that Forde's statements to police, which were made five months after the wiretap, were admissible because they were sufficiently attenuated from the taint of the Fourth Amendment violation. He has not presented any arguments or evidence to show why he did not receive a full and fair opportunity to litigate his claim. *See Stone*, 428 U.S. at 494-95. In any event, the SJC decision was not contrary to, and did not involve an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).  The claim under the Fourth Amendment for habeas relief will therefore be denied.

## IV.     Conclusion

Accordingly, for the reasons set forth above, Long's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is DENIED.

**So Ordered.**

|  |  |
|---|---|
|  | /s/  F. Dennis Saylor |
|  | F. Dennis Saylor IV |
| Dated: July 2, 2019 | United States District Judge |